| | |
|---|---|
| JUDY WILLIAMS, MARY WADE & LUCINDA THOMAS | CIVIL ACTION NO. 18-2472 c/w 18-6113 |
| VERSUS | JUDGE ZAINEY |
| | MAGISTRATE DOUGLAS |
| IQS INSURANCE RISK RETENTION GROUP, INC., ET AL. | APPLIES TO: ALL CASES |

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE WITNESSES, EXHIBITS AND MOTION FOR RECONSIDERATION OF MOTION TO STRIKE FRAUD DEFENSE

**NOW INTO COURT,** through undersigned counsel, come Defendants, Southern Refrigerated Transport, Inc. ("SRT"), IQS Insurance Risk Retention Group, Inc. ("IQS") and Eric Darnell Martin, respectfully submit this memorandum in opposition to Plaintiffs' Motion *in Limine* to Exclude Witnesses and Exhibits and Motion for Reconsideration of Motion to Strike.[1] As more fully supported herein, Plaintiffs' motion should be denied.

### INTRODUCTION

Plaintiffs' motion seeks to exclude witnesses and exhibits on the basis that Defendants somehow allegedly failed to comply with the disclosure requirements Rule 26 after asserting fraud as an affirmative defense. However, Plaintiffs fail to even state which specific witnesses and exhibits they are seeking to exclude. More importantly, Plaintiffs completely ignore the fact that Defendants have already identified numerous witnesses and exhibits on multiple occasions throughout this litigation in their pleadings, written discovery responses and again in their witness and exhibit list.

---

[1] *See* Rec. Doc. 193.

Critically, Rule 26(e) specifically provides that "[a] party who has made a disclosure under Rule 26(a)…must supplement or correct its disclosure or response…in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, **_and_ if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."[2]** To that end, the Advisory Committee comments to Rule 26 further provide that:

> **There is, however, <u>no obligation</u> to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition or when an expert during a deposition corrects information contained in an earlier report.[3]**

Consequently, Defendants had no obligation to supplement their Rule 26 disclosures with information already made known to the Plaintiffs by Defendants in their pleadings, discovery responses and witness and exhibit list. Defendants also had no obligation to disclose information that Plaintiffs already had, but intentionally decided to conceal from the Defendants. Simply put, Defendants have not violated any disclosure requirement of Rule 26 in this case.

Even if there was a violation, which is expressly denied, it was both justified and harmless. Plaintiffs have had more than ample time to notice the depositions of witnesses but have made no effort whatsoever to do so. In fact, Plaintiffs have not sought to depose a single witness at all other than Defendant, Eric Darnell Martin, and Dean Tekell, Defendants' accident reconstruction expert.

As made abundantly clear by Defendants in the numerous pleadings already filed in this case, Plaintiffs have continuously and intentionally concealed critical information throughout the course of this litigation, including the identity of eye witnesses to the subject accident. Plaintiffs

---

2      Rule 26 of the Federal Rules of Civil Procedure.
3      *Id.* (Notes of Advisory Committee)

have come forward with no evidence at all to suggest that they have sustained any harm or prejudice.

Finally, Plaintiffs also ask the Court to "reconsider" their prior Motion to Strike on the sole basis that Defendants allegedly violated Rule 26's disclosure obligations. Again, Plaintiffs have not come forward with any evidence whatsoever to suggest that they have been harmed or prejudiced at all, or that Defendants have even violated Rule 26. Plaintiffs have simply offered the Court no justifiable reason as to why it should reconsider their Motion to Strike.

As such, and as more fully supported herein, Plaintiffs' motion should be denied.

### FACTS AND PROCEDURAL HISTORY

This lawsuit arises out of an alleged June 6, 2017 side-swipe accident at the intersection of Chef Menteur Highway and Downman Road in New Orleans involving a tractor trailer driven by Eric Darnell Martin, as an owner operator with SRT, and a vehicle driven by Lucinda Thomas with Judy Williams, Mary Wade and Dashontae Young as passengers. Plaintiffs, Judy Williams and Mary Wade, filed suit on March 6, 2018.[4] Plaintiff, Lucinda Thomas, filed suit on June 5, 2018.[5] These suits were consolidated on July 25, 2018.[6]

On September 12, 2018 the Court issued a scheduling order setting the deadline for the parties to file their witness and exhibit list for March 15, 2019.[7] Meanwhile, the current discovery deadline is May 10, 2019[8] and this matter is set for a jury trial on June 3, 2019.[9]

---

[4]     *See* Rec. Doc. 1 (Civil Action No. 18-2472)
[5]     *See* Rec. Doc. 1 (Civil Action No. 18-6113).
[6]     *See* Rec. Doc. 27.
[7]     *See* Rec. Doc. 36.
[8]     *See* Rec. Doc. 191.
[9]     *See* Rec. Doc. 36.

On August 24, 2018, all three (3) Plaintiffs responded to Defendants' written discovery and each Plaintiff stated as follows: ***"The Plaintiff is not aware of any known eyewitnesses other than the parties to the accident made the basis of this lawsuit."***

Plaintiffs were then deposed on September 13, 2018, and again no witnesses to the alleged accident were identified. In fact, during her deposition Lucinda Thomas was specifically asked whether she called anyone from the scene of the accident from her cell phone and she testified under oath that the only people she called were her husband, Anthony Thomas, and cousin, Cleveland Mitchell.

On February 11, 2019 Defendants filed their Affirmative Defense of Fraud, in which they identified several witnesses and exhibits.[10] One of the primary witnesses identified by Defendants in their Affirmative Defense is a man named Damian LaBeaud. Plaintiff, Mary Wade, called LaBeaud 30 minutes before the alleged accident. Plaintiffs, Lucinda Thomas and Mary Wade, also both had numerous telephone conversations with LaBeaud immediately after the alleged accident. Meanwhile, LaBeaud's certified cell phone records show that he had numerous telephone conversations with Plaintiffs' prior counsel, Patrick Keating, several times immediately before and after the alleged accident. In fact, Defendants have just now discovered that shortly after the alleged accident the Plaintiffs even went to a Cane's restaurant and had fried chicken with both Damian LaBeaud and Patrick Keating. This was discovered on April 9, 2019 when the Plaintiffs were re-deposed.

Yet, throughout the course of this litigation, Plaintiffs have intentionally concealed Damian LaBeaud's identity as a witness to the alleged accident and have failed to disclose having any conversations with him on the day of the alleged accident. To date, Plaintiffs still

---

[10] See Rec. Doc. 102 and 103.

have not supplemented their Rule 26 disclosures or written discovery responses to identify any additional witnesses to the subject accident.

In fact, the very first time that the Plaintiffs ever admitted to having any knowledge of LaBeaud's identity at all was not until their second depositions, which took place just two weeks ago on April 9, 2019. For example, Mary Wade and Lucinda Thomas have now testified as follows:

## MARY WADE'S NEW TESTIMONY

Q.   All right. While traveling on the day of the accident to New Orleans East, where the accident actually occurs, did you make or receive any phone calls on your cell phone?

**A.   I don't remember.**

Q.   You don't remember making or receiving any phone calls?

**A.   Huh-uh, not that I can remember.**

Q.   Do you know Damian Labeaud?

**A.   I knew him after the accident.**

Q.   Okay. Cell phone records indicate that you actually spoke to him before the accident, you have any reason to dispute that?

**A.   Yes.**

Q.   Which is what?

**A.   I never talked to him.**[11]

\* \* \*

Q.   It's been asserted that there was an attempt to purchase drugs from people in New Orleans on the day of the accident and that is how or why a phone call may have been placed to Damian Labeaud; is that true?

---

[11]   *See* Second Deposition of Mary Wade, dated 4/9/19, at pp. 21-22, attached hereto as **Exhibit A**.

MR. DORSEY:

      I'm going to advise my client to assert Fifth Amendment rights based upon any intention you may be implying. But I'm going to let her answer how she got the number.

BY MR. PRATHER:

Q.     Is that true, Ms. Wade?

**A.     Yes.**

Q.     It is?

**A.     Yes.**

Q.     And you didn't tell us that in your previous deposition, did you?

**A.     No.**

Q.     And why is that?

**A.     Well, it didn't sound right.[12]**

* * *

Q.     Now, had you ever spoken to Damian LaBeaud prior to the day of the accident?

**A.     No.**

Q.     How did you get his number?

**A.     I got a number from some guys in the traffic.**

Q.     From who?

**A.     Some guys in the traffic.**

Q.     Some guys in the traffic?

**A.     Yes.**

Q.     All right.

---

[12]     Wade Depo at pp. 23-24

**A.** **The phone number that I – I had. I never knew Damian LaBeaud.**

Q. Okay, I'm going to trying to see –

**A.** **Until after the accident.**[13]

\* \* \*

Q. What do you mean "In the traffic"?  I don't understand.

**A.** **Some guys in the traffic were smoking marijuana and ---**

Q. Driving down the road?

**A.** **Yeah.**

Q. Okay. Did you-all pull them over and talk to them?

**A.** **No, we were in traffic.**

Q. Rolled down your window and talked to them?

**A.** **No, my window was already down, and I smelled the marijuana.**

Q. Okay. Where was this that this happened?

**A.** **I don't remember.**[14]

\* \* \*

Q. What was the purpose of talking to the people in the "traffic"?

**A.** **Because they was smoking marijuana.**

Q. All right.

**A.** **And I smoke marijuana.**

Q. I got you.  And what did you say to those people?

**A.** **That it smelled good and they gave me a phone number…..**

Q. Did you – okay. And they gave you Damian LaBeaud's phone number?

---

[13]     Wade Depo at pp. 24-25.
[14]     Wade Depo at pp. 25-26.

**A.** **They gave me a phone number.**

Q.     Do you know what phone number it was?

**A.** **No.**

Q.     All right. Did you call that person whose number they gave you –

**A.** **No.**

Q.     -- from your cell phone? You didn't?

**A.** **No.**

Q.     Did you ever call Damian LaBeaud that you know of on that day of the accident?

**A.** **After the accident, yeah.[15]**

                                        * * *

Q.     Now, did Mr. LaBeaud come to the scene of the accident?

**A.** **I think he was there.**

Q.     You think he was there, you're not sure?

**A.** **I think he came. I – after – let me see. I learned that that was Damian LaBeaud when he was talking to the police officer.[16]**

                                        * * *

Q.     Did you ever obtain any marijuana on the day of the accident?

MR. DORSEY:

Objection.

BY MR. PRATHER:

Q.     In New Orleans?

MR. DORSEY:

Don't answer. Objection. Actually, you can answer.

---

[15] Wade Depo pp. 27-28
[16] Wade Depo pp. 30-31.

THE WITNESS:

Huh?

MR. DORSEY:

You can answer.

THE WITNESS:

**No, I didn't. I never did.**[17]

\* \* \*

Q.     Tell me exactly what you recall, if you recall, saying to him [Damian LaBeaud] when you got him on the phone.

**A.     What would I say to him?**

Q.     Uh-huh.

**A.     When?**

Q.     When you talked to him on the phone for the first time.

**A.     He introduced – he talked about the lawyers, so I was asking – questioning him about Patrick Keating.**

Q.     He gave you one of Patrick's cards or gave you-all one of Patrick's cards? Because that's what you already told us.

**A.      He gave her the card.**

Q.     Which her?

**A.     Ms. Thomas.**

Q.     Ms. Thomas.

**A.     Yeah.**

Q.     What I was actually asking, Ms. Wade, is when you talked to him on the phone about obtaining drugs, do you recall the actual conversation?

---

[17]      Wade Depo pp. 32-33.

**A.**     **I never talked to him.**

Q.     You never talked to him about it?

**A.**     **No.**

Q.     How many times did you talk to him on that day? Was it just there at the scene?

**A.**     **It was after the accident.**

Q.     Was it at the scene, face-to-face like we're sitting?

**A.**     **No.**

Q.     All right. Was it on the phone?

**A.**     **After the accident, yeah.**

Q.     All right. And what was he telling you?

**A.**     **I was ask – questioning him about the lawyer.**

Q.     About Mr. Keating?

**A.**     **Yes.**

Q.     Okay. Anything else that you-all talked about?  The accident –

**A.**     **No.**

Q.     -- facts or anything?

**A.**     **No. It was always, when I talked to him, it was about Patrick Keating.[18]**

* * *

Q.     All right. Now, why would you have so many conversations with Mr. LaBeaud on that day?  Your cell phone connects with his cell phone on several occasions, do you know why that would be?

**A.**     **To talk about Patrick Keating.**

Q.     How many different times did you need to talk about Patrick Keating?

**A.**     **Several times.**

---

[18]     Wade Depo pp. 34-35

Q.      Were you in the car with Ms. Thomas when that – those conversations were occurring?

**A.      Yes.[19]**

                                        * * *

Q.      Okay. How many different men did you speak to on the – at the scene of the accident?

**A.      I didn't talk to nobody but the two guys in the car. Before the accident you said?**

Q.      No. At the scene.

**A.      At the scene?**

Q.      Uh-huh.

**A.      I don't remember talking to anybody.**

Q.      Okay. You didn't talk to Mr. Labeaud at the scene?

**A.      No.**

Q.      Okay.

**A.      I don't remember talking to him.**

Q.      But you do know he was at the scene, correct?

**A.      Yeah, after I saw his picture.**

Q.      Okay. When did you first realize that the gentleman at the scene was the same guy that you're trying to call concerning drugs?

**A.      After I saw the number on the card that he gave her.**

Q.      Okay. So when you talked to him on the phone the day of the accident, and he's talking to you about Pat Keating, it never occurs to you that it's the same guy about the drugs or you just never –

**A.      I never even put it together.  Never even worried about it after.[20]**

---

[19]     Wade Depo p. 40
[20]     Wade Depo pp. 41-42.

* * *

Q.     Another explanation for Mr. Labeaud's presence on the cell phones is that he was trying to get one of you ladies to hook him up with Dashontae Young, do you know anything about that?

**A.     Ms. – her grandmother, Ms. Thomas.**

Q.     Ms. Thomas?

**A.     Yeah.**

Q.     All right. What do you know about that?

**A.     He was just flirting with her, I know that much.**

Q.     When was he flirting with her if he didn't –

**A.     After – after the accident.**

Q.     At the scene?

**A.     Uh-huh.**

Q.     Was Ms. Young out of the vehicle?

**A.     Yes.**

Q.     Okay. And Mr. Labeaud was present?

**A.     Yes.[21]**

* * *

Q.     Okay. And I want you to be clear on this. It's your testimony that you got Mr. Labeaud's phone number from the guy with the dreads; is that right?

**A.     Dreads.**

Q.     Lock hair, right?

**A.     Yes.**

Q.     Is that correct?

---

[21]     Wade Depo pp. 43-44.

**A.** **Yes.**

Q. And he gave you that number, basically, through the window?

**A.** **Yes.**

Q. And the purpose of him giving you that number was to potentially get some marijuana or whatever he was smoking, correct?

**A.** **Maybe.**

Q. What else would be the reason?

**A.** **I mean, if I could have gotten some, I would have.**

Q. Okay. But that was why you got the number, that's what it's for?

**A.** **Yeah.**

Q. Okay. And it's your testimony under oath that you never spoke with or texted Damian Labeaud prior to the accident?

**A.** **No.**

Q. No, you did not?

**A.** **(shakes head)**

Q. So if your records and his records show that your phone and his phone connected prior to the accident, you have absolutely no explanation for that?

**A.** **No.**[22]

\* \* \*

Q. Okay. Did he [Labeaud] ever discuss with you his involvement with getting a personal injury client for Mr. Keating?

**A.** **No.**

Q. But as far as you know, since you-all didn't hook up to discuss drugs, that was his sole role in this accident that you were involved in, was getting Mr. Keating's information to you-all and providing information on Mr. Keating; is that correct?

---

[22]    Wade Depo pp. 78-79

**A.**     **Wait. Say that again.**

Q.     His sole role, the only thing he's involved with, according to your testimony, with respect to your accident –

**A.**     **Uh-huh.**

Q.     -- is providing you-all with Mr. Keating's information and providing you-all with information about Mr. Keating?

**A.**     **Yes.**[23]

* * *

Q.     Last question for you, Ms. Wade, is under oath, it's your testimony that Mr. Labeaud had nothing to do with this accident, other than showing up and giving you and your co-passengers information concerning Mr. Keating; is that correct?

**A.**     **He gave her the card.**

Q.     Gave Ms. Thomas that information, that's your testimony?

**A.**     **Yes.**[24]

### LUCINDA THOMAS' NEW TESTIMONY

Q.     All right. Now, you didn't know Damian Labeaud before this accident?

**A.**     **No, I didn't**

Q.     Did you know Patrick Keating?

**A.**     **No.**

Q.     Did you know anybody that repre – that was represented by Patrick Keating prior to the accident?

**A.**     **No. I found out that day.**

Q.     That day?

**A.**     **Yeah.**

Q.     How?

---

[23]     Wade Depo p. 84.
[24]     Wade Depo p. 87.

**A.** **I called a friend and told them I was in an accident.**

**Q.** Uh-huh. And who is that?

**A.** **Troy Smith.**

**Q.** Troy Smith?

**A.** **Uh-huh.**

**Q.** All right. And you called Troy Smith after the accident?

**A.** **Yes.**

**Q.** Okay. And who is Troy Smith?

**A.** **A friend of mine.**

**Q.** I mean, I get that he's Troy Smith, but.

**A.** **A friend of mine.**

**Q.** Okay. How do you know Mr. Smith?

**A.** **From church.[25]**

\* \* \*

**Q.** Okay. All right. Now, you talked to Mr. Smith after the accident, right?

**A.** **I may have – yeah, I may have talked to him before, too.**

**Q.** Oh.

**A.** **I'm not positive.**

**Q.** Oh. What would you have talked to him about before the accident?

**A.** **We always talk.**

**Q.** Why is that?

**A.** **We're friends.**

---

[25]    *See* Second Deposition of Lucinda Thomas taken on 4/9/19, pp. 25 – 26, attached hereto as **Exhibit B.**

Q.     Okay. In fact, you were speaking with Mr. Smith for roughly an hour during that journey; isn't that correct?

**A.     I may have.**

Q.     And Mr. Smith was in a truck accident and represented by Mr. Keating, correct?

**A.     I don't know. I know he had him for Workman Comp.**

Q.     Workers' Comp?

**A.     Yeah.**

Q.     So you don't know that Mr. Keating has filed a lawsuit in connection with a motor vehicle accident wherein he represents Mr. Smith?

**A.     No.[26]**

* * *

Q.     Now, when this conversation with the fellow smoking the marijuana occurred, did you – could you hear it? Could you hear them talking?

**A.     No.**

Q.     All right.

**A.     I know they were yelling out the window, but I don't know what they were saying.**

Q.     Okay. You didn't have any idea why she would be talking to what I presume to be a stranger on the highway or on the roadway, anyway?

**A.     No. I just thought they were flirting or something, I didn't ..**

Q.     Flirting. All right.  Did you know she was asking for something in order to obtain marijuana?

**A.     No, I didn't.**

Q.     When did you learn that?

**A.     It was a couple of weeks ago.[27]**

---

[26]     See Thomas Depo p. 30-31.
[27]     Thomas Depo pp. 34-35

* * *

Q.    All right. Is there anything more to your relationship with Mr. Smith, other than just being friends?

**A.    No.[28]**

* * *

Q.    And you didn't know prior to the day of the accident that he was a client of Mr. Keating?

**A.    I know he had a Workman Comp.**

Q.    You knew that before the accident?

**A.    I'm trying to think if it was before. I think it was before.**

Q.    Okay.

**A.    I'm not sure.**

Q.    All right. And according to your prior lawyer and actually, for that matter, Ms. Wade, you-all, while at the accident scene, were given attorney cards by – from who we believe to be Mr. Labeaud and one of those was Pat Keating's card; is that correct?

**A.    Right.**

Q.    And that's how you learned – or that's how you wind up getting in touch with Mr. Keating?

**A.    Right.**

Q.    Okay. Did Ms. Wade ever obtain marijuana on – or any drugs, for that matter, on that day that you know of?

**A.    Not that I know of.**

Q.    Did Dashontae know Damian Labeaud prior to the day of the accident?

**A.    I don't believe.**

Q.    Pardon?

---

[28]    Thomas Depo p. 35.

-17-

**A.** **I don't believe, no.**

Q. Did Mr. Labeaud ever contact you subsequent to the accident in reference to Dashontae?

**A.** **What you mean, before the accident?**

Q. No, after.

**A.** **Oh, after the accident, yes.**

Q. What was he asking?

**A.** **He wanted to talk to her or, say, like go on a date.[29]**

* * *

Q. You didn't know Mr. Labeaud before that day, correct?

**A.** **Right.**

Q. Some guy in a car smoking a marijuana cigarette or in any way smoking marijuana, I don't know what form, gives you-all or gives Ms. Wade a phone number, right?

**A.** **Right.**

Q. That phone number winds up being Damian Labeaud's phone number?

**A.** **Correct, but..**

Q. But?

**A.** **She told me that the person that they told her to ask for was a Tony, not a Damian.**

Q. Yeah, I understand that.

**A.** **Okay.**

Q. Tony Green is an alias.

**A.** **Oh, okay.**

Q. But it winds up being Damian Labeaud, does it not? You know that now?

---

[29]    Thomas Depo p. 36-37.

**A.** **Yeah, I know that.**

Q. Okay. Good. And then you-all don't ever – according to Ms. Wade, you never speak to him prior to the accident?

**A.** **No.**

Q. And then miraculously he shows up at the accident scene after it happens, that's your testimony; is that correct?

**A.** **Yes.[30]**

\* \* \*

Q. Now, you called, according to phone records, Damian Labeaud's cell phone at 1:06 p.m. on the day of the accident. How did you get his number?

**A.** **It was on the back of the card he gave me.**

Q. It was on the back of Mr. Keating's card?

**A.** **Uh-huh.**

Q. All right. And why did you call him?

**A.** **To get in touch with Mr. Keating. I asked him was that a good attorney or whatever.**

Q. Okay. So he gave you the card –

**A.** **Uh-huh.**

Q. -- with Mr. Keating's printed stuff on the front?

**A.** **Right.**

Q. And then on the back was Mr. Lebeaud's number?

**A.** **Right.**

Q. When did you determine that it happened to be the same phone number that was given to Ms. Wade should she need to find some marijuana?

**A.** **To this day, I didn't know it was the same number.[31]**

---

[30]    Thomas Depo pp. 40 – 42.

As can clearly be seen from both Mary Wade and Lucinda Thomas' newly obtained deposition testimony, there is no question that both Plaintiffs have known of Damian LaBeaud's identity and that he was present at the scene since June 6, 2017, the date of the alleged accident. Yet, they have continuously and intentionally concealed and failed to disclose this information to Defendants until just this month.

Moreover, on April 9, 2019 Plaintiffs also responded to Defendants Requests for Admissions in which they denied even knowing Damian LaBeaud, but admitted to speaking to him on the day of the accident:[32]

**Request for Admission No. 20:**

Admit Lucinda Thomas knows Damian LaBeaud.

**Response No. 20:**

Denied as written, further responding only through the course of this litigation have Plaintiffs learned of Damian LaBeaud's identity.

**Request for Admission No. 21:**
Admit Mary Wade knows Damian LaBeaud.

**Response No. 21:**

Denied as written, further responding only through the course of this litigation have Plaintiffs learned of Damian LaBeaud's identity.

**Request for Admission No. 22:**

Admit Judy Williams knows Damian LaBeaud.

**Response No. 22:**

Denied as written, further responding only through the course of this litigation have Plaintiffs learned of Damian LaBeaud's identity.

---

[31]    Thomas Depo pp. 55-56.

[32]    *See* Plaintiffs' Responses to Defendants' Requests for Admissions, attached hereto as **Exhibit C.**

**Request for Admission No. 24:**

Admit that Mary Wade spoke to Damian LaBeaud on June 6, 2017.

**Response No. 24:**

Admitted, further responding only through the course of this litigation have Plaintiffs learned Damian LaBeaud's identity.

***

**Request for Admission No. 26:**

Admit that Lucinda Thomas spoke to Damian LaBeaud on June 6, 2017 *after* the alleged subject accident.

**Response No. 26:**

Admitted, further responding only through the course of this litigation have Plaintiffs learned Damian LaBeaud's identity.

**Request for Admission No. 27:**

Admit that Mary Wade spoke to Damian LaBeaud on June 6, 2017 *after* the alleged subject accident.

**Response No. 27:**

Admitted, further responding only through the course of this litigation have Plaintiffs learned Damian LaBeaud's identity.

Obviously these responses are untrue. They knew of Mr. LaBeaud well before suit was filed. They knew of him within minutes of the accident.

Meanwhile, just this week Plaintiffs' produced 4 photographs for the very first time depicting Lucinda Thomas' vehicle in a Cane's restaurant parking lot.[33] The photographs were taken on the same day of the alleged accident. Critically, Damian LaBeaud can be seen in these photographs as shown below:

---

[33] *See* Photographs Produced by Plaintiffs on April 23, 2019, attached hereto as **Exhibit D.**



These photographs were not produced to Defendants until April 23, 2019, where Plaintiffs' counsel revealed them at the deposition of Defendants' accident reconstruction expert.

Plaintiffs' continuous intentional concealment of critical information throughout the course of this litigation has severely hindered Defendants' fraud investigation. Plaintiffs failed to identify Damian LaBeaud in their initial disclosures at the outset of this litigation. We also now know that Plaintiffs also concealed critical photographs from Defendants until just this week. Plaintiffs were asked to produce all photographs of Lucinda Thomas' vehicle on July 27, 2018. Defendants' accident reconstruction expert will undoubtedly now need to supplement his expert report in light of Plaintiffs failure to timely produce these photos.

Meanwhile, Defendants have properly and timely identified and disclosed all witnesses and exhibits known to date that will be used to support their defense. This information was disclosed immediately after being discovered in Defendants' pleadings, discovery responses and again in their witness and exhibit list. Defendants have not concealed anything from the Plaintiffs in this case. Nothing.

Due to Plaintiffs' intentional concealment of critical information and evidence in this case, Defendants did not have—and were prevented from discovering—key evidence until

recently. Any alleged delay or failure by Defendants to supplement their Rule 26 disclosures in this case was directly caused by the Plaintiffs' intentional concealment of critical information.

After all, Defendants could not supplement their disclosures with information they did not have. More importantly, the Plaintiffs are not entitled to exclude information at trial that they have had in their possession the entire time, but instead chose to intentionally conceal from the Defendants. Plaintiffs should not be rewarded for their intentional concealment of critical information. As such, Plaintiffs' motion should be denied.

<u>LAW AND ARGUMENT</u>

A.    DEFENDANTS HAVE NOT VIOLATED RULE 26

Rule 26(e) specifically provides that "[a] party who has made a disclosure under Rule 26(a)…must supplement or correct its disclosure or response…in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, ___**and if**___ **___the additional or corrective information has not otherwise been made known to the other___** **___parties during the discovery process or in writing___."[34]** The Advisory Committee comments to Rule 26 further provide:

> **There is…no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition or when an expert during a deposition corrects information contained in an earlier report.[35]**

In short, there is no obligation to supplement Rule 26 disclosures with information that has already been made known to the parties in writing or during the discovery process.

As such, unlike the Plaintiffs, Defendants have not violated any disclosure obligation under Rule 26 in this case. Had the Plaintiffs properly identified the identity of critical eye

---

[34]     Rule 26 of Federal Rules of Civil Procedure.
[35]     *Id.* (Notes of Advisory Committee).

witnesses in their Rule 26 initial disclosures, Defendants could have supplemented their Rule 26 disclosures.  Likewise, if the Plaintiffs would have identified the identity of these witnesses in their written discovery responses, Defendants could have supplemented their Rule 26 disclosures.  Additionally, if the Plaintiffs would have identified the identity of these critical witnesses during their original depositions, Defendants again could have supplemented their Rule 26 disclosures.  However, because the Plaintiffs have intentionally concealed critical information and evidence of fraud throughout this litigation, they prevented Defendants from supplementing their Rule 26 disclosures.

Indeed, Plaintiffs are the ones who have concealed the identity of critical eye witnesses who the Plaintiffs knew were present at the accident scene. Witnesses who the Plaintiffs also knew spoke to the investigating officer at the scene and claimed to have witnessed the accident occur.  Witnesses who the Plaintiffs even spoke to on the phone numerous times on the date of the subject accident.  And witnesses who we also now know Plaintiffs shared a meal with after the alleged accident on the very same day along with their prior attorney, Patrick Keating. Due to Plaintiffs' intentional concealment of this critical information and evidence, Defendants were prevented from obtaining the very information that Plaintiffs now seek to exclude.

Ultimately Defendants were forced to discover this evidence and the identity of critical eye-witnesses to the subject accident through sources other than the Plaintiffs themselves, such as Plaintiffs' certified cell phone records produced by Sprint and AT&T.

Shortly after receiving Plaintiffs' certified cell phone records, Defendants amended their pleadings to assert the affirmative defense of fraud. In that pleading, as well as several others filed in this matter, Defendants have specifically identified and disclosed the identity of numerous witnesses and exhibits to support their fraud defense.  Defendants also properly

disclosed the identity of numerous witnesses and exhibits in their responses to Plaintiffs discovery requests and in Defendants' witness and exhibit list that was timely filed in accordance with this Court's Scheduling Order.

Defendants had no obligation whatsoever to disclose information that had already been made known to the Plaintiffs in writing and during discovery. Defendants are also not required to disclose information that will be used solely for impeachment purposes at trial. As such, Defendants have not violated any Rule 26 disclosure obligation in this case. Plaintiffs have come forward with no evidence whatsoever to suggest that Defendants violated Rule 26. Thus, Plaintiffs' motion should be denied.

**B.** **ANY ALLEGED OMISSION OF WITNESSES AND EXHIBITS IN DEFENDANTS' RULE 26 DISCLOSURES WAS SUBSTANTIALLY JUSTIFIED AND HARMLESS**

Even if Defendants' alleged omission of witnesses and exhibits somehow violated Rule 26, which is expressly denied, it was not only substantially justified, it caused no harm whatsoever to the Plaintiffs. After all, it is the Plaintiffs themselves who intentionally concealed and prevented Defendants from obtaining the very information that they are now seeking to exclude.

Indeed, Plaintiffs have failed to come forward with any evidence at all to even suggest that Defendants have caused them harm or prejudice in this case.. None whatsoever. The Plaintiffs, and the Plaintiffs alone, are the only reason that Defendants were prevented from identifying witnesses and exhibits to support their fraud defense until only recently. Had Plaintiffs not violated Rule 26 and timely disclosed the identity of Damian LaBeaud at the beginning of this case, Defendants could and would have supplemented their Rule 26 disclosures. They did not.

If Plaintiffs truly had been harmed or prejudiced, they should have specifically stated how they have been harmed or prejudiced in their motion. They did not. Instead, Plaintiffs do not even specify exactly which witnesses or exhibits they are seeking to exclude at all. Moreover, Plaintiffs' motion even admits that prior Plaintiffs' counsel's request for Defendants to supplement their Rule 26 disclosures was after Defendants' had already raised their affirmative defense of fraud, a pleading wherein Defendants specifically identify and disclose the identity of numerous witnesses and exhibits in writing to the Plaintiffs.

Also, although Plaintiffs' prior counsel's email on February 26, 2019 suggests that he had made a prior request to Defendants to supplement their disclosures, this is simply not the case. Instead, that email was the very first time Plaintiffs had ever requested Defendants to supplement their Rule 26 disclosures. In fact, Plaintiffs even admit that "it would have been far less prejudicial to Plaintiff had defense properly supplemented their Rule 26(a)(1) disclosures after this request."[36] But they fail to advise the Court that Defendants provided Plaintiffs with their written discovery responses shortly thereafter that specifically identified numerous witnesses and exhibits.

Moreover, on April 5, 2019 Plaintiff filed a motion to extend the discovery deadline.[37] The Court granted Plaintiffs' motion and extended the discovery deadline to May 10, 2019.[38] Yet, since then Plaintiffs have not made any effort whatsoever to depose a single witness in this case other than Defendant, Eric Darnell Martin, and Defendants' accident reconstruction expert, Dean Tekell.[39] There is simply no evidence whatsoever to suggest that Plaintiffs have been prejudiced or harmed in any way by Defendants in this case.

---

[36]     Rec. Doc. 193-1 at p. 3.
[37]     Rec. Doc. 188.
[38]     Rec. Doc. 191.
[39]     Rec. Docs. 102 and 103.

In addition to the numerous pleadings filed in this matter, Defendants' discovery responses and timely filed witness and exhibit list effectively cured any alleged failure to supplement their Rule 26 disclosures. As such, Plaintiffs' motion should be denied.

**C.     PLAINTIFFS' MOTION TO STRIKE SHOULD NOT BE RECONSIDERED BY THE COURT**

Finally, without any support whatsoever, Plaintiffs have also moved the Court to reconsider Plaintiffs' Motion to Strike. However, Plaintiffs' motion to reconsider is based solely on their misguided allegation that Defendants somehow violated Rule 26 by not supplementing their disclosures. As noted at length above, Defendants have not violated Rule 26.

Defense counsel has spent an enormous amount of time and effort investigating fraud in this case. Because Plaintiffs' have intentionally concealed critical information since the very beginning of this lawsuit, this has been a very expensive and time consuming process. The estimated costs associated with Defendants' fraud investigation well exceeds $30,000.00. After all, Defendants have been forced to obtain critical information and evidence through other sources that the Plaintiffs have had knowledge of since the day of the alleged accident.

For example, because Plaintiffs failed to disclose the information, Defendants were required to obtain Plaintiffs' cell phone records to discover that they had numerous conversations with Damian LaBeaud before and after the alleged accident. Defendants were also forced to retain a forensic expert, Barry G. Dickey, to analyze the NOPD body camera video from the accident and other NOPD body camera videos from other suspicious side-swipe accidents where Damian LaBeaud has clearly appeared on the video as either a witness or victim.[40] Mr. Dickey also analyzed numerous photographs depicting Damian LaBeaud. Ultimately Mr. Dickey positively identified Damian LaBeaud in all three NOPD videos and the photographs, and will

---

[40]     *See* Rec. Doc. 120 and 134.

testify at trial that LaBeaud was in fact present at the scene of the accident in this case.[41]  Mr. Dickey also has confirmed that Mario Salomon was the passenger in LaBeaud's vehicle and present at the scene.

All of this time and money could have easily been avoided if Plaintiffs would have properly identified Damian LaBeaud and Mario Salomon at the beginning of this lawsuit. Plaintiffs failed to so. In fact, during the course of this litigation the Plaintiffs had numerous separate occasions to disclose the identity of both Damian LaBeaud and Mario Salomon, but they did not.  They should have identified them in their Rule 26 Initial Disclosures, but they did not. They also should have identified them in their written discovery responses, but again did not. They once again should have identified them during their first depositions, but they did not. Despite having this information since June 6, 2017, Plaintiffs made the conscious decision to conceal it from Defendants.

Surprisingly, Plaintiffs now ask the Court to reconsider their Motion to Strike Defendants' Fraud Defense claiming that Defendants did not identify witnesses and exhibits to support their fraud defense in their Rule 26 disclosures.  This is nonsensical.  Defendants were not even aware of fraud until recently.  Yet, Plaintiffs have had that information since the day of the alleged accident.

Meanwhile, Defendants still continue to receive additional information on nearly a daily basis concerning both LaBeaud and Salomon's involvement in other suspicious side-swipe accidents, all of which will be presented at trial to further support Defendants' fraud defense. However, Plaintiffs continue to obstruct and delay Defendants' ability to obtain discoverable information that should have been disclosed by the Plaintiffs at the inception of this lawsuit.

---

[41]    *See* Rec. Doc. 159-3.

## CONCLUSION

Plaintiffs' arguments to exclude witnesses and exhibits utterly fail to show any violation of Rule by Defendants. Even if there was somehow a violation, which there was not, Plaintiffs have come forward with no evidence whatsoever to even suggest that they have been harmed or prejudiced in this case. Based on the foregoing, Plaintiffs' motion should be denied and their prior Motion to Strike should not be reconsidered.

Respectfully submitted,

**GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, APLC**

*/s/ C. Bowman Fetzer, Jr.*
**JAMES A. PRATHER (#20595) (T.A.)**
**C. BOWMAN FETZER, JR. (#34541)**
3 Sanctuary Boulevard, Third Floor
Mandeville, Louisiana 70471
Telephone: 985-674-6680
Facsimile: 985-674-6681
***Counsel for Defendants***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 26th day of April, 2018, undersigned electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send notice of electronic filing to all counsel of record.

*/s/ C. Bowman Fetzer, Jr.*
**C. BOWMAN FETZER, JR.**